The FIRST BANK OF WHITING, Appellant (Garnishee-Defendant Below),

v.

SAMOCKI BROTHERS TRUCKING COMPANY, Appellee (Plaintiff Below).

No. 4–585 A 131.

Court of Appeals of Indiana, Fourth District.

June 17, 1987.

Rehearing Denied Aug. 6, 1987.

Robert E. Stochel, John M. O'Drobinak, P.C., Crown Point, for appellant.

David K. Ranich, East Chicago, for appellee.

MILLER, Judge.

The First Bank of Whiting (Bank) brings this appeal from a trial court judgment in proceedings supplemental in favor of Samocki Brothers Trucking Co. (Samocki). The trial court had initially granted judgment for Samocki against Region Construction Co. (Region) and James Hough on a promissory note and personal guaranty. During the course of its efforts to collect the judgment, Samocki served an order to appear, notice of adverse claim, and interrogatories upon Bank, as Region's depository bank. Bank failed to appear at hearing, filed its interrogatories two and a half months after service, honored numerous Region checks despite the adverse claim notice, and set off the remaining balances of Region's accounts to pay off notes held by Bank. Bank finally appeared before the trial court in response to a second verified motion whereupon the court entered judgment against it in the sum of $27,551.70 for Samocki's judgment against Region and accrued interest. Bank argues judgment was inappropriate 1) because Samocki's order and notice only froze Region's accounts for 60 days and it failed to obtain a second appropriate order pursuant to Ind.Code 28–1–20–1.1(a)(4) when 60 days expired, and 2) because Bank had a prior and superior right to Region's accounts pursuant to a security interest therein securing payment of Region's promissory notes. After a careful review of the relevant authority, it is our belief the trial court's decision was correct, and we affirm.

### ISSUES [1]

Rephrased, Bank's issues on appeal are:

1. Whether the trial court's judgment is contrary to law because Samocki lost any

---

1. Bank presented three issues for appeal, all of which assailed the trial court's findings of fact and conclusions of law:

   "1. Did the Trial Court commit reversible error when, [sic] it found that Samocki acquired a lien on the Region Bank Accounts even though the time period prescribed for such a lien had expired pursuant to statute, to-wit: I.C. 28–1–20–1.1(a)(4).
   2. Did the Trial Court commit reversible error when it found that the expired lien rights of Samocki in the Region Bank Accounts were superior to the perfected security interest of First Bank in those same deposit accounts.
   3. Did the Trial Court commit reversible error when it found that the First Bank acted with, 'an insiders position', 'self-dealing' and that such self-dealing was designed, 'to deceive Plaintiff' when there is insufficient evidence to support such conclusions and that the judgment of the Trial Court was contrary to Law."

   The problem we have with these issues is that it has long been the law in Indiana that findings are improper in a judgment rendered in proceedings supplemental. *Hutchinson v. Trauerman* (1887), 112 Ind. 21, 13 N.E. 412; *Beckman Supply Co. v. Newell* (1918), 68 Ind.App. 679, 118 N.E. 962; *Balz v. Benninghof* (1892), 5 Ind. App. 522, 32 N.E. 595.

   As our supreme court stated long ago, "We are of opinion ... that the provisions of our civil code requiring the special finding of facts and the statement of conclusions of law thereon, in an ordinary civil action, are not and were not intended to be applicable to proceedings supplemental to execution ..." *Hutchinson v. Trauerman,* 112 Ind. at 25–26, 13 N.E. at 414. The basis for this conclusion is found today in the statutes regulating proceedings supplemental: "All proceedings under this chapter after the order has been made ... shall be summary, without further pleadings, upon the oral examination and testimony of parties and witnesses." IND.CODE 34–1–44–8. And inasmuch as the statute prescribes the summary character of the proceedings, special findings are "supererogatory." *Balz v. Benninghof, supra,* 5 Ind.App. at 524, 32 N.E. at 596; *Beckman Supply Co. v. Newell, supra* (relying on 822 R.S. 1881, the original enactment of I.C. 34–1–44–8); *see also Marriage of Hudak* (1981), Ind.App., 428 N.E.2d 1333 (trial court properly rejected request for findings of fact in proceeding supplemental). Therefore, the trial court's special findings here must be treated as a general finding only in favor of Samocki. *See Beckman Supply Co. v. Newell, supra* ("Where a special finding of facts has been made in such a proceeding it will be treated as a general finding only." 68 Ind.App. at 686, 118 N.E. at 964.); *Balz v. Bennin-*

claim to Region's bank accounts when it failed to comply with Indiana's adverse claim statute;

2. Whether the trial court's judgment is contrary to law because the Bank had rights in Region's bank accounts prior and superior to Samocki's judgment.[2]

## FACTS

In June, 1982, Samocki filed a complaint against Region and Hough to collect monies due and owing under the terms of a promissory note and personal guaranty. On April 18, 1983, the trial court entered judgment against Region and Hough pursuant to stipulation and agreement of the parties for the sum of $16,836.16 principal, $2,873.84 accrued interest, and $3,000.00 attorney's fees. The judgment remained unpaid despite Region and Hough's agreement to make installment payments thereon.

On May 9, 1984, Samocki instituted proceedings supplemental to collect the judgment by filing a verified motion and serving summons, an order to appear and interrogatories upon Bank as garnishee-defendant. The court's order set the matter for hearing on June 11, and contained the following warning to Bank:

"Garnishee defendant is advised by this Court that disobedience of this Order to answer Interrogatories and mail or deliver same within the specified time or to appear and answer to property and obligations of the judgment debtors and bring books and records may be punished as contempt. Judgment or Order may be entered against the garnishee defendant as by default with respect to property and obligations specified in plaintiff's Motion or established as now or hereafter to be held or owing by such garnishee unless such garnishee appear and defends. Garnishee defendant further is advised that any claim or defense it may have in response to this Order or plaintiff's Motion may be raised without written answer. Garnishee defendant is also informed by this Court that this Order

---

*ghof, supra* ("the special finding ... must be treated as a general finding." 5 Ind.App. at 524, 32 N.E. at 596); *see also Uhl v. Liter's Quarry of Indiana, Inc.* (1979), 179 Ind.App. 178, 384 N.E.2d 1099 (" '[f]indings of fact are inappropriate ... when summary judgment is granted.' " *Id.* at 179, 384 N.E.2d at 1101.) In addition, we find nowhere in the record any request for findings pursuant to Ind. Rules of Procedure, Trial Rule 52, even if that rule were appropriate (which it is not under the summary procedures here). Therefore, we can consider this a general judgment supported by partial findings. *See McClamroch v. McClamroch* (1985), Ind.App., 476 N.E.2d 514.

This conclusion leaves Bank's appellate issues basically for naught to the extent they address the court's findings. However, we think the more appropriate solution would be to consider the court's findings as far as they supply its legal reasoning for rendering its judgment. *Cf. Bond v. Peabody Coal Co.* (1983), Ind.App., 450 N.E.2d 542 (summary judgment: "The trial court's statement as to its reasons affords the parties an opportunity to address the merits of the trial court's rationale on appeal and aids the appellate court in its review." *Id.* at 549, n. 3). This manner of review thus transforms Bank's issues into challenges that the court's judgment was contrary to law in three specific instances.

After considering Bank's three issues in this manner, we believe that, its third issue is superfluous to the crux of this case. Whether Bank

was an "insider" and abused its status to better its position at Samocki's expense would be an appropriate inquiry if the case involved either a dispute between corporate stockholders (*see, e.g., Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331) or charges of fraud in securities trading against corporate insiders. *See, e.g., Securities & Exchange Commission v. Texas Gulf Sulphur Co.* (1968), 2d Cir., 401 F.2d 833, *cert. denied Coates v. S.E.C.* (1969), 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756. No such scenario exists here, and the court's conclusions regarding Bank's "insider position" and "self-dealing" were inappropriate as irrelevant. Therefore, we deem it unnecessary to address Bank's third issue and confine ourselves instead to its first two issues, which are critical to the trial court's judgment and our review of Bank's appeal. *See Shuee v. Gedert* (1979), 182 Ind.App. 432, 395 N.E.2d 804 ("Matters unnecessary to a full and final determination of a cause should generally not be discussed by an appellate tribunal." *Id.* at 438, 395 N.E.2d at 808.)

2. Samocki declares Bank has waived this second issue for failure to include it in Bank's motion to correct error. *See* Ind. Rules of Procedure, Trial Rule 59; *Adkins v. Elvard* (1973), 155 Ind.App. 672, 294 N.E.2d 160. We believe otherwise. Paragraph five (5) of Bank's motion clearly brought before the trial court the issue of the priority of interests alleged by Bank and by Samocki. There was no waiver.

may constitute a lien in favor of plaintiff upon any property now or hereafter held for judgment debtors or any obligation now or hereafter owing to judgment debtors by such garnishee, and nay [sic] disposition of such assets after receipt of this Order and contrary to the ultimate determination of this Court as to the existence and amount of such lien will be made at the garnishee's risk."

Record, pp. 43–44.

At the time Bank was served on May 9, Region had two demand accounts with Bank, Account Nos. 17–648–6 and 18–558–2. During the month of May, Region Account No. 17–648–6 showed a beginning balance of −$16,410.53 and reflected credits and deposits totalling $181,359.33. After May 9, Bank also honored 27 checks written on the account in the sum of $30,-947.24. At the end of May, the account's balance was −$27,564.69 although the only other check paid was for $2,000.00. In June, that same account had deposits and credits of $112,695.69, no checks honored, and a concluding balance of −$24,038.13.

Account No. 18–558–2, on the other hand, began the month of May with −$14,712.32 followed by $88,000.00 in deposits and credits. During May, Bank honored 38 checks totalling $19,509.30, at least $2,567.91 of which were honored after service of Samocki's summons. The May ending balance was calculated at −$11,223.02. In June, Account No. 18–558–2 showed deposits and credits of $89,624.05 and, as with No. 17–648–6, no checks honored. Again, June ended with a negative balance of −$19,722.51. Although there is no direct testimony on the matter, there is evidence in the record that these negative balances were caused by Bank's direct application of the remainder of Region's deposits to debts owing to Bank and that any checks were paid by the accounts only with the express approval and at the direction of Bank. In summary, during the month of May when the garnishment order was in force, Bank honored over $30,000 worth of checks while taking in deposits and credits well over $250,000. Thus, there can be no doubt that the accounts had sufficient funds, despite the withdrawals, to cover Samocki's judgment but for Bank's exercise of an offset.

The trial court held the initial hearing as scheduled on June 11, but Bank neither appeared nor filed its answers to the interrogatories despite Samocki's counsel's efforts to contact Bank and its representatives the week before. After examination of Hough on assets available for execution, the court ordered the cause continued. Again, counsel attempted to get Bank to cooperate, this time by letter to Bank's attorney, to no avail. Finally, on July 17, more than 60 days after service, Bank filed its answers to interrogatories with the court.

The interrogatories, reputedly completed in May,[3] were answered under oath as follows:

"1. Do the defendants have any sums of money on deposit with you?

ANSWER: YES

\*       \*       \*       \*       \*       \*

4. What sums of money are held in each of the accounts on deposit with you?

ANSWER:    # 17–648–6    $6,344.63—
           # 18–558–2    $9,783.41—

5. To your knowledge, are there any other liens on these accounts?

ANSWER: NO."

Record, pp. 47–48.

On August 13, Samocki's counsel once more corresponded with Bank's counsel regarding the interrogatories and the status of Region's accounts in May and June. Counsel then made demand for Bank to pay the judgment due from Region pursuant to the proceedings supplemental. Counsel followed up with further correspondence on September 27, and upon Bank's failure to respond, filed a second

3. The interrogatories were mistakenly file-stamped with the same date Samocki filed its first verified motion, May 9. The copy of the interrogatories in the record do not otherwise indicate when they were completed nor when Ronald E. Lis, Bank's Vice-President, signed them. We are also unable to figure out from the evidence on which date Region's accounts reflected the balances set forth in the answers. However, Bank's witness at the November 8 hearing testified the interrogatories were prepared in May.

Verified Motion to Enforce Judgment by Proceedings Supplemental to Execution on October 24, naming Bank as garnishee-defendant.

Hearing was held on November 8, at which time Bank appeared by counsel and Anthony Carollo, vice-president of loan administration. At that time, Bank's counsel declared Bank did not oppose Samocki's exhibits as filed with its second Verified Motion insofar as they represented the status of Region's accounts. Instead, Bank's defense rested upon Carollo's testimony with respect to Region's debts owing to Bank. In this regard, Bank introduced without objection copies of three notes executed by Hough, as president of Region, in favor of Bank.

All three were renewal notes but varied in terms and amounts. Number 97901, dated June 17, 1983, created a "draw" up to $330,000 and was due on demand with quarterly installment payments of the interest. The second note, chronologically, was No. 97900 dated December 1, 1983. It too was a demand note, this time for $380,-000.00. The last note was No. 99200, categorized as "combined," in the sum of $259,-814.99. This note was executed February 9, 1984 and was due June 8, 1984. Each of the three notes were also accompanied by an allonge setting forth the terms of all the interests securing the payment of the notes according to previously executed security agreements. Among the security listed—which covered the usual accounts receivable, proceeds, equipment, fixtures, etc.—was

"any deposit balances to the credit of the debtor on the books of the Bank and any personal property of the debtor in which the debtor may have an interest which is now or may at any time hereafter come into the possession of the Bank...."

Record, pp. 99, 101, 104. (There was no testimony whether these security agreements were properly perfected.) Each note further provided the following:

"The Bank may, without notice or demand of any kind, appropriate and apply toward the payment of such of the Liabilities (whether before or after any of the Liabilities shall become due and payable), and in such order of application as the Bank may from time to time elect, any balances, credits, deposits, accounts or moneys which constitute Collateral hereunder."

*Id.* Bank formally demanded payment for these notes on or about June 22, 1984.

During examination of Carollo, counsel for both parties elicited various bits of information regarding Region and Bank's relationship: At the time of the November 8 hearing, Region owed $795,000 principal and approximately $125,000 interest on all its outstanding indebtedness to Bank, included in which were the negative balances of the two bank accounts. Also at that time, Bank was in the process of taking over all Region's assets in accordance with a written agreement between the parties, executed about one week prior to hearing. Under the terms of this agreement Bank would release Hough and Region from all further liability on the indebtedness in exchange for the company's assets. As a last matter, Carollo was unable to explain why Bank's answers to the interrogatories stated Bank had no knowledge of any liens on the accounts.

On the basis of this record, the trial court entered findings of fact, conclusions of law, and judgment on January 18, 1985, against Bank and in favor of Samocki in the amount of $27,551.70 plus interest at $7.59 per day. Bank filed a motion to correct error, which the court denied, and now presents the matter to us on appeal.

## DECISION

■ As we discussed in footnote 1, *supra*, we may not review this case on the basis of the court's findings of fact and conclusions of law. *See Beckman Supply Co. v. Newell* (1918), 68 Ind.App. 679, 118 N.E. 962; *Balz v. Benninghof* (1892), 5 Ind.App. 522, 32 N.E. 595. Rather, in proceedings supplemental, we are constrained to treat a trial court's judgment as being general only. However, the trial court's findings here are helpful in determining the basis for its ruling and in addressing Bank's allegations of errors in application

of the law. *Cf. Bond v. Peabody Coal Co.* (1983), Ind.App., 450 N.E.2d 542 (review of summary judgment aided by improper findings). We will therefore treat the court's decision as a general judgment supported by partial findings.

The gist of the trial court's rationale is that Samocki is entitled to judgment because, by following the appropriate statutory procedure, it acquired a lien on Region's accounts and because Bank's actions in ignoring this procedure forfeited any equitable claim of its own to the funds. These conclusions are the specific issues challenged here by Bank. Therefore, since Bank has raised no issue concerning the evidence, we are confined to addressing only questions of law. Under the circumstances, we are compelled to affirm the trial court because its judgment is sustainable on legal theories not contrary to the findings it set forth. *See Erie-Haven, Inc. v. Tippmann Refrigeration Construction* (1985), Ind.App., 486 N.E.2d 646 ("On review, a general judgment will be affirmed if it can be sustained upon any legal theory by evidence introduced at trial." *Id.* at 648); *McClamroch v. McClamroch, supra; Lawshe v. Glen Park Lumber Co.* (1978), 176 Ind.App. 344, 375 N.E.2d 275.

*Compliance with Indiana's Adverse Claim Statute.*

Bank argues vehemently that Samocki lost any claim it may have had to Region's accounts when it failed to comply with Indiana's adverse claim statute. Although we believe Samocki may indeed have failed to comply with all the technicalities required by the statute, we also believe Bank's behavior deprives it of any equitable right to complain.

The statute in question is I.C. 28–1–20–1.-1, which states:

"(a) Notice to any bank, trust company, or savings bgank doing business in this state of an adverse claim to a deposit standing on its books to the credit of any person, or of an adverse claim of authority on the part of corporate officers or other agents to deal with, draw on or otherwise control such a deposit, or of a money judgment against any person who has an interest in any deposit with the bank or trust company, either individually or jointly with others, shall not be effectual to require said bank or trust company to recognize the adverse claim or adverse claimants or in any manner to hold or restrict the withdrawal activity pertaining to the deposit. The bank or trust company may, without regard to the notice and without being liable in damages to any party, honor the order or instructions of the depositor or agent by its records authorized to control said deposit, unless said adverse claimants at the time of giving the aforesaid notice:

\* \* \* \* \* \*

(4) when the adverse claimant is a money judgment creditor attempting to garnish a deposit, the money judgment creditor shall provide the bank or trust company notice of the garnishment proceedings, the unpaid amount of the judgment, and sufficient identifying information about the judgment defendant to enable the bank or trust company to reasonably verify the judgment defendant as its depositor and shall serve upon the bank or trust company an order issued by a court of competent jurisdiction pursuant to the laws authorizing proceedings supplementary to execution."

Bank has no quarrel with Samocki's observance of this first portion of the statute. On May 9, 1984, Samocki (a money judgment creditor) served Bank with summons, a verified motion for proceedings supplemental (containing Region's identity along with the amount due from Region on the judgment), and an order to appear issued by the trial court. What vexes Bank is this next portion of I.C. 28–1–20–1.1:

"When a money judgment creditor provides the notice and information and serves the bank or trust company the order, as provided in clause (4) of this subsection, the bank or trust company shall restrict the withdrawal of the amount then or thereafter on deposit in which the judgment defendant has an interest, whether individually or jointly with others, not to exceed the unpaid amount of the judgment, for the maxi-

mum period of sixty (60) days without liability for damages to any person by reason of its failure to treat the deposit in accordance with its agreement with the depositor, pending the court's determination of the judgment creditor's rights, if any, in and to the deposit. *If sixty (60) days elapse and no further appropriate order of court pertaining to the deposit has been received by the bank or trust company, the restriction on withdrawals imposed by this section shall be removed."*

(Emphasis added.) It is the lapse of the 60–day "freeze" set forth herein without "further appropriate order" that Bank claims denies Samocki's right to any portion of Region's accounts.

Recalling a few basic facts, we set forth the following chronology of pertinent events as Bank would have us review them:

| | |
|---|---|
| May 9, 1984 | – service of garnishment notice and order on Bank for Region's accounts |
| July 8, 1984 | – Court's order expires according to I.C. 28.1–20.1.1 |
| October 24, 1984 | – service of second garnishment notice |
| November 8, 1984 | – hearing held where Bank's officer testifies there are no more funds in either of Region's accounts |

Bank points out that the statute's 60–day "freeze" on Region's accounts began to run on May 9 and expired long before Samocki initiated a second garnishment proceeding on October 24. Bank argues Samocki has not complied with I.C. 28–1–20–1.1 by failing to get a "further appropriate order of Court pertaining to the deposit" which would restrict withdrawals after that 60–day period ran. Therefore, Bank urges that we consider Samocki's claims forfeit for failure to follow the statutory procedure. As we develop later, such absurd logic has cost Bank more than the judgment we affirm here.

Fleshing out the facts somewhat, we see the true state of affairs to be:

| | |
|---|---|
| May 9, 1984 | – service of garnishment notice and order on Bank for Region's accounts |
| May 31, 1984 | – Bank honors over $33,000.00 in checks on Region's accounts since May 9 and sets off remainder |
| June 4, 1984 | – Samocki's counsel calls Bank with regard to filing answers to interrogatores—Bank fails to respond |

| | |
|---|---|
| June 11, 1984 | – Bank fails to appear at hearing on garnishment |
| June 12, 1984 | – Samocki's counsel corresponds with Bank's counsel to no avail |
| June 30, 1984 | – Bank sets off Region accounts |
| July 8, 1984 | – Court's order expires according to I.C. 28-1-20.1.1 |
| July 17, 1984 | – Bank files answers to interrogatories |
| August 13, 1984 | – Samocki's counsel again corresponds with Bank's counsel; again, no response |
| September 27, 1984 | – Samocki's counsel makes one last effort to reach Bank's counsel |
| October 24, 1984 | – Service of second garnishment notice |
| November 8, 1984 | – Hearing held where Bank's officer testifies there are no more funds in either of Region's accounts |

The above course of conduct in which the Bank engaged in defiance of Samocki's properly served notice of adverse claim obviated any necessity for Samocki's further compliance.

It is clear that Indiana's adverse claim statute was intended to protect banks and similar financial institutions from having to choose between claimants to deposits in their keeping. *Blaircom v. Hires* (1981), Ind., 423 N.E.2d 609 (predecessor to I.C. 28–1–20–1.1). Upon proper service in accordance with the statute, banks are obligated to freeze the depositor's account for at least 60 days until all the parties' respective rights to the funds can be determined, and they will not be liable to any claimant for the duration of that period. In other words, a bank will not be liable to its depositor for not honoring its checks for the duration of the order. Similarly, the bank will not be liable to a garnishor for not paying its demand until a judicial determination of rights to the account.

Numerous similar statutes have been enacted throughout the various states on the initiative of the American Bankers Association in order to provide that

"when a third party gives notice to a bank of an adverse claim to a deposit, that the bank does not have to recognize such claim until it is directed to do so by proper court order or unless a proper indemnifying bond is furnished to the bank."

*Gendler v. Sibley State Bank* (1945), N.D. Iowa, 62 F.Supp. 805, 811; *Goldstein v. Riggs National Bank* (1972), D.C.Cir., 459 F.2d 1161. As with Indiana's enactment,

the general purpose is "to protect banks ... against liability to its depositor should it refuse to honor his order, and against liability to the adverse claimant should the claim prove valid." *Arizona Bank v. Wells Fargo Bank, N.A.* (1985), 148 Ariz. 136, 139, 713 P.2d 337, 340; *Bourgeois v. Chase Manhatten Bank of New York* (1956), S.D.N.Y., 139 F.Supp. 265; *Aarts Productions, Inc. v. Crocker National Bank* (1986), 179 Cal.App.3d 1061, 225 Cal. Rptr. 203; *Ciriello v. Eastchester Savings Bank* (1973), 74 Misc.2d 425, 343 N.Y.S.2d 526. And it is also clear that an adverse claimant's failure to abide by the provisions of an adverse claim statute leaves a financial institution with no recourse but to honor its depositor's demands.

In *Landrum v. Security National Bank of Roswell* (1985), 104 N.M. 55, 716 P.2d 246, the New Mexico Court of Appeals held, among other things, that adverse claimants had failed to comply with the pertinent statute when they served "Forged Endorsement Affidavits" upon the bank rather than the statutorily prescribed notice. The court ruled that the bank had improperly dishonored several checks because the defective notice was in essence no notice of an adverse claim at all. To like effect are the cases wherein other courts ruled that adverse claimants failed to procure proper restraining orders and like process or indemnity bonds, and therefore, the bank involved either improperly froze the fund, *Kassow v. Integrity Trust Co.* (1933), 19 Pa.D. & C. 159, or properly ignored the adverse claim and honored its depositor's demands. *E.g., Staley v. Brown* (1962), 244 Miss. 825, 146 So.2d 739; *Ginsberg v. Manufacturers Hanover's Trust Co.* (1968), 55 Misc.2d 1052, 287 N.Y. S.2d 818; *Sanders v. First National Bank & Trust Co. of Tulsa* (1955), Okla., 292 P.2d 160; *Phil Grossmayer Co. v. Campbell* (1958), 214 Ore. 265, 328 P.2d 320; Annot., 62 A.L.R.2d 1116 (1958). Perhaps more to the point here is the situation where an adverse claimant who rests on his rights loses his claim.

The seminal case in such circumstances is *Gendler v. Sibley State Bank, supra*, 62 F.Supp. 805. In that case, the adverse claimant had mistakenly remitted funds to Sanders. When the claimant discovered the error, its agent contacted Sanders' depository bank and requested a refund out of Sanders' account. The bank held the funds for six days then, upon advice of counsel, turned the money over to Sanders. Eleven months later, the adverse claimant brought suit for the overpayment against the Bank and Sanders. The federal district court, in ruling that the adverse claimant had lost its claim to the account, stated:

"it is the duty of the third party claimant to diligently and promptly institute the necessary legal proceedings to stop payment to the depositor by court order or process and if such claimant does not so do the bank is released from liability."

*Id.* at 813. Therefore, the claimant's failure to diligently bring legal process to bear earlier than eleven months caused it to lose any claim that the bank prematurely released the funds to its depositor. In fact, the court mentioned in dictum that due to the possible liability the bank could face from its depositor, the claimant may have only been able to show diligence if it had brought the necessary suit within that six days the bank "froze" the fund. *See Huff v. Oklahoma State Bank* (1922), 87 Okla. 7, 207 P. 963 (adverse claimant should have brought suit within nine days). Although the *Gendler* suit relied on common law principles to reach its decision (because Iowa did not have a statutory procedure at the time), its holding is nonetheless applicable here, standing as it does for the proposition that an adverse claimant—such as Samocki—could lose its interest in a debtor's account for failure to comply with applicable time limits for procuring court orders.

This proposition is also instructive in another way pertinent to the appeal here. One of the key problems leading to the enactment of adverse claim statutes was the indefinite and unsatisfactory common law concept of whether an adverse claimant had brought appropriate action against a bank within a reasonable time. What constitutes a reasonable time? *Staley v. Brown, supra*, 146 So.2d 739. Therefore,

the statutes' almost uniform requirement that a bank be served with an order or other appropriate process from the *outset* alleviated courts having to make judgments based on a calculation of days past between service of notice and the claimant's institution of suit. From this logic, it is apparent that the further requirement in Indiana's statute—that an additional order must issue within 60 days of the first—is meant to assure banks that adverse claimants will pursue their claims diligently and not expose banks to additional liability from their depositors. Keeping this premise in mind, we believe that if Bank had frozen the accounts upon receipt of the order, had not effected a set-off on its own behalf, and had properly responded to the interrogatories, Samocki's failure to extend its order would have forfeited any right to the accounts based on the May 9 order.[4] However, under the facts presented here, we do not believe Samocki should be penalized for such failure.

█ Our chief consideration in reaching this particular resolution of the issue is Bank's behavior throughout the case. The simple fact of the matter is that Bank wholly and utterly failed to obey the court's order served on May 9. Through the month of May, it continued to honor checks drawn on both of Region's accounts. Admittedly, this course of action would have been proper so long as the account balances still contained sufficient funds to cover the "unpaid amount of the judgment." I.C. 28–1–20–1.1. But then Bank exercised its right of set-off on both accounts, leaving no funds available to comply with the order. As we will expand further when we address the second issue, Bank could not do both. Suffice it to say for purposes of this particular issue, *Bank improperly ignored the court's order.* Such conduct would ordinarily make Bank liable to Samocki for the amount of the unpaid judgment. *See Owens-Classic, Inc. v. Swager Tower Corp.* (1985), Ind.App., 480 N.E.2d 232 (banks which failed to freeze accounts in accordance with garnishment

order liable to payment of funds in hand at date of service and deposited thereafter); *see also Pearce v. Dill* (1897), 149 Ind. 136, 48 N.E. 788; *Union Bank & Trust Co. v. Vandervoort* (1951), 122 Ind.App. 258, 101 N.E.2d 724 (common law: service of execution on bank created equitable lien upon funds on deposit for which bank was liable when it paid account out to depositor without consent of claimant or order of the court). As this court stated in a similar situation,

> "[F]rom the day of the service of summons the garnishee is held accountable to the judgment creditor for the property due or owing from him to the judgment debtor ... [I]f the garnishee transfers the funds to the debtor after the equitable lien attaches, he will still be liable to the creditor in the garnishment proceedings and is treated as still having the funds in his possession."

*Lakeshore Bank & Trust Co. v. United Farm Bureau Mutual Insurance Co.* (1985), Ind.App., 474 N.E.2d 1024, 1026–27 (garnishment to reach insurance proceeds); *Hoadley v. Caywood* (1872), 40 Ind. 239; *Cooke v. Ross* (1864), 22 Ind. 157.

Bank must remember that Samocki instituted valid proceedings from the very beginning when it served the appropriate information and order on May 9. From that point on, Bank disregarded the notice and continued to allow the accounts to be actively drawn upon. Bank then failed to either serve answers to the interrogatories or to appear at the scheduled hearing. As our chronology of events set forth above indicates, Samocki still attempted to get Bank to respond. On July 8, the statutory 60–day period expired, requiring (according to Bank) that Samocki obtain an additional order to restrict withdrawals from the accounts. However, it seems difficult for us to imagine how Bank can justify its failure to restrict withdrawals in May based on the nonoccurrence of an event that was not required until *July*! As Samocki's brief

---

**4.** If Bank had frozen the accounts for the prescribed 60–day period but, in addition had been evasive to the proceeding as here, we would be presented with a more difficult question as to Samocki's equities.

declares, Bank cannot be allowed to shield itself from its own misbehavior under the statute by claiming the statute's protection from liability by pointing out that Samocki also failed to comply after the fact. That's akin to requiring the barn be locked after the horse has already bolted. Besides, what would have been the point? Samocki had instituted the proper suit as required by the statute, and as we stated above, the additional notice after 60 days is to insure a claimant's diligence. We fail to see how Samocki could have been more diligent, particularly in the face of Bank's obstinate refusal to abide by the procedures. As a sister court has stated so well:

"The statute was designed to save a bank from deciding at its peril which contesting claimant is entitled to the proceeds of an account it holds for one of them. *It was not intended to afford a bank the opportunity to improve its own position* to the disadvantage of one or both."

*Domain Industries, Inc. v. First Security Bank & Trust Co.* (1975), Iowa, 230 N.W.2d 165, 169.[5] Why should Samocki be required to obtain another order that Bank would in all likelihood have ignored also? Indeed, the authorities seem to be in agreement that Bank's failure to freeze the accounts makes it liable to Samocki as garnishor. For us to concede the validity of Bank's argument would also condone its actions. This we will not do. Therefore, we conclude on the facts presented here that Samocki's failure to comply with the technical requirements of I.C. 28–1–20–1.1 does not affect its recovery in this case.

Our conclusion on this issue is necessarily affected by Bank's second issue in that although Bank did not freeze Region's ac-

counts it did have its own legitimate right in the accounts by way of set-off.

*Samocki's Garnishment v. Bank's Right of Set-Off*

The focus of this second issue is what interest each of the parties has in Region's accounts and, if each has a legitimate interest, which party must be accorded superior rights. Before addressing the true thrust of this issue, we must dispense with the parties' contentions that are *not* applicable. Bank argues that it has a security interest in Region's accounts by virtue of the security agreements referenced in each of the three notes and of perfection of that interest by Bank's possession of the accounts. Contrary to Bank's position, such a situation was (and is) not covered by Indiana's version of Article 9 of the Uniform Commercial Code governing secured transactions:

"This article does not apply

\*    \*    \*    \*    \*    \*

(k) to a transfer in whole or in part of ... any deposit, savings, passbook or like account maintained with a bank...."

Ind.Code 26–1–9–104(k) (1982) (current version at Ind.Code 26–1–9–104(1); *Domain Industries, Inc. v. First Security Bank & Trust Co., supra,* 230 N.W.2d 165. Whatever right Bank has in Region's accounts, it is clearly not a security interest. *See Citizens National Bank of Whitley County v. Mid-States Development Co.* (1978), 177 Ind.App. 548, 380 N.E.2d 1243.

Of an equally unsupportable nature is Samocki's argument that we should determine the parties' priorities in the accounts by application of the bankruptcy principles of equitable subordination. *See, e.g., Matter of Mobile Steel Co.* (1977), 5th Cir., 563 F.2d 692. The three conditions that must

---

5. In *Domain Industries, Inc. v. First Security Bank & Trust Co.* (1975), Iowa, 230 N.W.2d 165, claimant filed an action for conversion against the bank in which debtor had an account. Claimant had lent money to debtor to finance a feed store and secured payment of the promissory note by properly perfected interests in debtor's inventory, equipment, supplies, accounts receivable, and the proceeds of all said property. After debtor's default claimant made both oral and written demand upon the bank for the funds in debtor's bank account. The bank refused and instead applied the balance of the account to an unmatured indebtedness owed it by debtor. In overturning the trial court's dismissal of the claimant's action, the Supreme Court of Iowa declared that, even though the claimant did not properly comply with Iowa's adverse claim statute for lack of an appropriate order or bond, the issue still remained whether the bank could exercise its right of set-off of a bank account in which properly secured and identifiable proceeds owing to the claimant may have been deposited.

be met for application of the principle hinge in great part upon the Bankruptcy Code itself.[6] We are not dealing with a bankruptcy case, and Samocki would have great difficulty fulfilling the required elements in order to show it is entitled to relief. This is not to say our ultimate decision does not indeed rest upon equitable principles—it does. However, relying upon the bankruptcy concept of equitable subordination is unwarranted under its legal requirements. So, in getting to the true resolution of the parties' rights, we can ignore these arguments of the parties and address the law as we have found it to be.

■ First, there can be no dispute that Samocki acquired an equitable lien on Region's accounts upon service of the garnishment order upon Bank. *See Lakeshore Bank & Trust Co. v. United Farm Bureau Mutual Insurance Co, supra,* 474 N.E.2d 1024; *Union Bank & Trust Co. v. Vandervoort, supra,* 122 Ind.App. 258, 101 N.E.2d 724. As this court has recently declared, "[W]hen an execution is issued upon a judgment, the judgment creditor acquires a lien ... which attaches to the judgment debtor's general personalty that is subject to execution." *Deetz v. McGowan* (1980), Ind.App., 403 N.E.2d 1160. Our next concern then is to define *Bank's* rights to Region's accounts, for it did have an equitable claim to them.

■ The arrangement and legal rights between a bank and its depositor is well-grounded in Indiana common law: "Money deposited in a general account becomes the property of the bank; the depositor becomes the bank's creditor to the extent of the deposit." *Citizens National Bank of Whitley County v. Mid-States Development Co., supra,* 177 Ind.App. at 557 n. 8, 380 N.E.2d at 1248 n. 8; *Peoples State Bank v. Caterpillar Tractor Co.* (1938),

213 Ind. 235, 12 N.E.2d 123; *First National Bank, Martinsville v. American Fletcher National Bank & Trust Co.* (1985), Ind. App., 480 N.E.2d 964. Thus, as a general principle, Bank owed to Region whatever sums Region deposited in its accounts as with any ordinary debt. Drawing checks on these accounts obligated Bank to fulfill the order to the payee as "assignee" of the debt, and payment of those checks by Bank impliedly acknowledged its indebtedness to Region for that particular sum. However, a bank's indebtedness to its depositor can be counterbalanced by an indebtedness owed by the depositor to the bank and by its attendant remedy—the right of set-off.

A bank's right of set-off is also well entrenched in Indiana common law:

"When the depositor becomes indebted to the bank, a mutual debtor-creditor relationship arises that justifies a bank's right of set-off, *i.e.,* a self-help device for extinguishing mutual debts. The right arises by operation of law ... and is founded both on fairness and on the nature of the bank deposit which permits the depositor to erase any mutual indebtedness by his withdrawal...."

*Citizens National Bank of Whitley County v. Mid-States Development Co., supra,* 177 Ind.App. at 558 n. 8, 380 N.E.2d at 1248–49 n. 8; *First National Bank, Martinsville v. American Fletcher National Bank & Trust Co., supra,* 480 N.E.2d 964; *Lincoln National Bank & Trust Co. of Fort Wayne v. Peoples Trust Bank* (1978), 177 Ind.App. 312, 379 N.E.2d 527; *American Fletcher National Bank & Trust Co. v. Flick* (1969), 146 Ind.App. 122, 252 N.E.2d 839. This right of set-off is not without limit although Indiana courts do not seem to have addressed many of these restrictions specifically.[7] Regardless, for

---

**6.** According to the Fifth Circuit Court of Appeals, the power of equitable subordination cannot be wielded without the following:

1) "The claimant must have engaged in some type of inequitable conduct."

2) "The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant."

3) "Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy [Code]."
*Matter of Mobile Steel Co.* (1977), 5th Cir., 563 F.2d 692, 700.

**7.** Indiana courts clearly declare that set-off can occur when the debt is due. *See Second National Bank of Lafayette v. Hill* (1881), 76 Ind. 223; *Peoples State Bank v. Caterpillar Tractor Co.*

purposes of this case, we will assume without deciding that Bank had a valid and enforceable right to set off Region's accounts upon receipt of garnishment on May 9. The next inquiry is what effect Samocki's garnishment order had on Bank's right of set-off.

■ As a general proposition of law, a bank's right of set-off is superior to the equitable lien of a judgment creditor, and a bank may exercise that right when served with the garnishment. *E.g., Bee Jay's Truck Stop, Inc. v. Department of Revenue* (1980), 86 Ill.App.3d 7, 41 Ill.Dec. 257, 407 N.E.2d 755; *Herd v. Ingle* (1986), Mo. App., 713 S.W.2d 887; *Board of Trustees of Vacation Trust Carpenters Local No. 1780 v. Durable Developers, Inc.* (1986), Nev., 724 P.2d 736; *Industrial Commissioner v. Five Corners Tavern, Inc.* (1979), 47 N.Y.2d 639, 419 N.Y.S.2d 931, 393 N.E.2d 1005 (statutory); *Walter v. National City Bank of Cleveland* (1975), 42 Ohio St.2d 524, 330 N.E.2d 425; *Marrison v. Hogue* (1950), 57 Ohio Abs. 571, 95 N.E.2d 15. The basic rationale for allowing this result is because the garnishing creditor steps into the shoes of the debtor and is subject to the same defenses. As one federal court has put it,

"[t]he service of an attachment execution has the effect of an equitable assignment of the thing attached. It puts the garnishee in the relation to the attaching creditor which he had sustained to his former creditor. He may make the same defense to the attachment by evidence of set off or of other equities that he might have made if sued by his original creditor."

*General Electric Credit Corp. v. Tarr* (1978), W.D.Pa., 457 F.Supp. 935, 938; *Oxford v. Metter Lumber Co.* (1961), 104 Ga. App. 758, 123 S.E.2d 156. Ordinarily then, under the law, Bank would have been entitled to set off Region's accounts at the time it received Samocki's notice (assuming there were no other limitations as set forth in footnote 7, *supra*). However, Bank waived its right of set-off in this instance, and Samocki's lien prevails.

■ The jurisdictions that have addressed fact situations similar to the one here have almost uniformly held that a garnishee's treatment of a debtor's assets inconsistent with its immediate right of set-off is a waiver of that right in the face of the garnishor's claim. *See generally* Annot., 110 A.L.R. 1268 (1937); Annot., 106 A.L.R. 62 (1937). There may be several ways for a bank to waive its right of set-off, but the most obvious is when a bank, after service of garnishment, allows its depositor to withdraw funds from the account or honors checks drawn on the account. *See Walters v. Bank of America National Trust & Savings Ass'n* (1937), 9 Cal.2d 46, 69 P.2d 839; *First National Bank & Trust Co. of Tulsa v. Lundquist* (1935), 172 Okla. 453, 45 P.2d 524; *Prudential Loan & Trust Co. v. Metzler* (1913), 66 Ore. 224, 133 P. 1191. The conclusion courts generally draw from such conduct is an admission by the bank of an indebtedness to its depositor inconsistent with its assertion of set-off, that its depositor is indebted to *it.*

For instance, in what is one of the earliest cases deciding the issue, the Supreme Court of Oregon ruled a garnishee bank waived its right of set-off when it paid checks to the order of its depositor from his account after the service of prejudgment garnishment. As the court stated in support of its decision, "The bank waived the privilege of applying the funds upon Metzler's notes by paying him the same during the pendency of the garnishment proceedings. By so doing it clearly indicated that there was no intention on its

(1938), 213 Ind. 235, 12 N.E.2d 123; *Aurora National Bank v. Dils* (1897), 18 Ind.App. 319, 48 N.E. 19. But there seem to be no specific cases denying set-off for unmatured debts as there are in other jurisdictions. *E.g., State National Bank of Decatur v. Towns* (1953), 36 Ala.App. 677, 62 So.2d 606; *Tri State Bank of East Dubuque v. Colby* (1986), 141 Ill.App.3d 807, 96 Ill.Dec. 15, 490 N.E.2d 1037; *Maryland Cooperative Produc-*

*ers v. Bell* (1955), 206 Md. 168., 110 A.2d 661. Nor are there any cases in Indiana dealing with a bank's right to set-off when it also holds security interests in other collateral, as occurred in the case at bar. *E.g., Pines Trailer Corp. v. Roaring Express Co.,* (1970), 127 Ill.App.2d 46, 261 N.E.2d 709; *Jordan v. Lavin* (1946), 319 Mass. 362, 66 N.E.2d 41.

part to do so. . . ." *Id.* at 1193. In *First National Bank & Trust Co. of Tulsa v. Lundquist, supra,* the Supreme Court of Oklahoma used the same reasoning when it held a bank waived set-off when it pulled its depositor's funds out and transferred them to another account upon which its depositor continued to draw checks. The bank never applied any of the money to the notes it held but instead used the sum to pay off other creditors. The court declared the bank's election to treat the account in this manner was a waiver of its claim of set-off. A somewhat similar fact situation occurred in *Walters v. Bank of America National Trust & Savings Ass'n, supra.* There, the bank made a bookkeeping entry after service of garnishment, crediting its depositor's account to an outstanding note. The bank then allowed the depositor to draw on the account and paid outstanding checks so drawn. Two weeks after the first bookkeeping entry, the bank credited the account with the sum "credited" to the note, even though no new deposits had been made, and debited the same amount from the note. The court held the bank accountable to the third party claimant:

> "Its liability as a garnishee is clearly defined, and the rights of the attaching creditor may not be defeated by its arbitrary refusal to conform its duties and obligations as such. Its liability is not determined by an agreement between itself and the judgment debtor as to the application of the fund, but by the law which defines its liability as such garnishee."

*Id.* at 57, 69 P.2d at 844; *see also Wild v. Horst* (1971), La.App., 250 So.2d 179 (bank lost right of charge-back as against garnishor when it honored checks and account balance dropped below judgment amount when payment was stopped on a deposit). Other authority is to the same effect.

The Appellate Court of Illinois has ruled that when an employer does not deduct its set-off from its employee's paycheck at the time of garnishment, it waives the right to assert the set-off on later paychecks. Payment is considered an admission of indebtedness to the employee in contradiction to the right to assert the counter-indebtedness. *Southeast National Bank of Chicago v. Ravin* (1962), 35 Ill.App.2d 366, 182 N.E.2d 925; *Burke v. Congress Hotel Co.* (1935), 280 Ill.App. 493.[8] In *Holt's Sporting Goods Co. of Lubbock v. American National Bank of Amarillo* (1966), Tex. Civ.App., 400 S.W.2d 943, a bank waived its right to set-off when it did not accelerate the maturity of its depositor's debt but instead accepted regular installment payments. Another bank lost the same right when it renewed its depositor's note rather than asserting its matured right to set-off. *Obergfell v. Booth* (1920), 218 Ill.App. 492. In a slightly different situation, a bank was estopped from claiming a set-off when a bankruptcy trustee relied upon the bank's failure to claim it at the time of attachment. *In re Brockton Shoe Manufacturing Co.* (1934), D.Mass., 8 F.Supp. 959.

In a situation almost on point, the Supreme Court of Nebraska ruled a garnishee-bank lost its valid right of set-off due to its improper response to garnishment proceedings. In *United Seeds, Inc. v. Eagle Green Corp.* (1986), 223 Neb. 360, 389 N.W.2d 571, the trial court granted judgment to United Seeds and against Eagle Green in the sum of $6,074.47 on April 4, 1984. On May 15, evidently in anticipation of a garnishment notice, Eagle Green's bank broke with tradition and instead of extending notes due it by Eagle Green, requested payment on the notes in the sum of $9000. This money was debited from Eagle Green's account around noon on May 16 but was not credited to the notes until May 17, the next business day. In the

---

**8.** One court has stated that this result is prohibited if the employer and employee have set up a bona fide drawing account to accommodate installment payments to reduce the employee's debt. *See Anchorage Helicopter Service, Inc. v. Anchorage Western Hotel* (1966), Alaska, 417 P.2d 903. Put in another situation, the Illinois appellate court in *Southeast National Bank of Chicago v. Ravin* (1962), 35 Ill.App.2d 366, 182 N.E.2d 925, made a special point of noting that the garnishee in that case exercised its own discretion as to how much to retain as set-off and how much to pay out as salary, and the garnishee lost its rights to the garnishing creditor.

meantime, United Seeds caused garnishment summons to be served on the bank at 3:15 p.m. on May 16. The bank responded negatively to the standard garnishment interrogatories, even though it had agreed to honor Eagle Green's checks and approximately $35,000 flowed through the account within fifteen days. The supreme court determined first that the Bank had failed to comply with Nebraska's adverse claim statute: "The checking account statement indicates that there was no interruption of the banking relationship as a result of the garnishment. Eagle Green continued to draw on the account and to make deposits." *Id.* at 573. Second, the court determined the bank lost any right of set-off it might otherwise have entertained by allowing Eagle Green to use the accounts while circumventing the garnishment process. "Such an agreement is inconsistent with an intent to exercise the right of setoff, and will not be upheld." *Id.* at 574. Further, the court stated the bank's post-garnishment actions regarding the nonresponsive interrogatories and in allowing Eagle Green to draw on the account was a waiver of its right of set-off. In conclusion, the court declared:

"The $9,000 transaction between Eagle Green and the Bank of Millard on May 16 was not a valid setoff, and any continuing right of setoff was lost due to the bank's improper response to the garnishment proceeding."

*Id.* at 575. It is therefore evident that a bank can lose its right of set-off based upon its conduct after receiving notice of garnishment. Bank's conduct here was of just such a nature.

After receipt of Samocki's garnishment process on May 9, Bank continued to pay out checks drawn on both Region's accounts. One can safely assume—and infer from the evidence presented to the trial court in the end-of-the-month balances—that Bank set off the remaining deposits to its own benefit. In June, Bank honored no checks but continued to exercise its right to set off the funds deposited. In July, Bank finally answered its interrogatories (supposedly prepared in May) to the effect that, not only did it not owe Region any money (despite the payment of checks), it also had no lien on the accounts! It is apparent to us that Bank was playing fast and loose with Region's accounts in order to protect its own interests but in the process saving to itself the discretion of which of Region's creditors to pay. The irony of this whole affair is that Bank will not only have to pay Samocki, it probably honored over $30,000 in checks needlessly if it had only exercised its right of set-off immediately upon service of Samocki's summons.

Bank clearly waived its defense of set-off against Samocki's claim by its behavior, and such improper conduct put it outside the protection of the adverse claim statute, as discussed above. Bank is therefore liable to pay Samocki's judgment against Region. The tenor of the trial court's findings and conclusions are not to the contrary and indicate to us that its judgment was based on such equitable principles.

We therefore affirm.

YOUNG and HOFFMAN, JJ., concur.